85 P.3d 656

**STATE of Idaho, Plaintiff–Respondent–Cross Appellant,**

v.

**Scott D. YAGER, Defendant–Appellant–Cross Respondent.**

No. 25881.

Supreme Court of Idaho,
Boise, November 2003 Term.

Feb. 11, 2004.

Molly J. Huskey, State Appellate Public Defender; Sara B. Thomas, Chief, Criminal Division, Boise, for appellant. Sara B. Thomas and Mark J. Ackley argued.

Hon. Lawrence G. Wasden, Attorney General; L. LaMont Anderson, Deputy Attorney General, Boise, for respondent. L. LaMont Anderson argued.

## SUBSTITUTE OPINION

### THE COURT'S PRIOR OPINION DATED JANUARY 5, 2004, IS HEREBY WITHDRAWN

BURDICK, Justice.

### NATURE OF THE CASE

Scott D. Yager appeals from his judgment of conviction following a jury verdict of guilty of first-degree murder. The State has filed a cross-appeal contesting the district court's interpretation of the statutory aggravator defined in I.C. § 19–2515(h)(9), which compelled the district court to reject the death penalty and impose a fixed life sentence. Yager argues that to allow the State to again seek the death penalty in a resentencing hearing would violate the constitutional and statutory prohibitions against double jeopardy.

### FACTUAL AND PROCEDURAL BACKGROUND

On the night of June 17, 1998, Idaho State Trooper Linda Huff was shot in the parking lot of the Idaho State Police District Office in Coeur d'Alene in a confrontation with Scott Yager. Trooper Huff was on duty, had just completed some paperwork in the office and was returning to her patrol car. Trooper Huff suffered injuries from at least eleven of the rounds fired by Yager, who was hit by at least one of the rounds fired by Trooper Huff. The fatal wound to Trooper Huff was from a round fired by Yager while his pistol was in near contact with the head of Trooper Huff.

ISP Officers were on the scene within seconds, and they immediately made a security check of the area. Yager appeared from the trees, walking in the direction of deputies who were searching the area. A deputy commanded him to drop the gun that he was carrying. After a second command, Yager dropped the gun, but continued walking toward the deputies. Then, he was commanded to the ground and was forcibly handcuffed, as he refused to cooperate with the officers' commands. Five officers were involved in Yager's arrest, all of which had their weapons drawn and pointed at Yager.

Yager was then asked by an officer "Where's your buddy?" and "Where's your car?" Yager answered that he was alone and that he rode his bike. A dispatcher, who had opened the back door of the ISP District Office when she heard Trooper Huff's screams, identified Yager as the individual she had seen kneeling over Trooper Huff with a gun.

Ballistics evidence established that Yager's gun was the same used to murder Trooper Huff. The slugs removed from Yager's body were fired from Trooper Huff's gun. Hair analysis established that a hair found on Yager's gun could have been from Trooper Huff. DNA evidence established that blood found inside the barrel of Yager's gun was from Trooper Huff. Two uniform citations found in Yager's room at his parents' home were the only items seized pursuant to a search warrant that were admitted into evi-

dence. The search warrant was for letters, notes, diary, guns, ammo, citations, motive evidence, drugs, paraphernalia and pawnshop receipts.

Yager was charged with first-degree murder of Trooper Huff, an individual "who was a peace officer acting in the lawful discharge of her official duty." The state notified the district court of its intent to seek the death penalty.

The district court heard Yager's motion for change of venue based on pretrial publicity. The motion was denied, but the district court would allow the subject to be revisited during the jury selection process. The district court denied the renewed motion. The district court also denied the motions to suppress (a) statements made at the time of the arrest and (b) items recovered from Yager's room pursuant to the search warrant. The district court denied those motions as well.

The jury found Yager guilty of first-degree murder and use of a deadly weapon. The district court then conducted a hearing on aggravation and mitigation, as required before a court may impose a sentence of death. Concluding that the state had failed to establish beyond a reasonable doubt any of the statutory aggravating factors, the district court imposed a fixed life sentence for the murder and a fixed, fixteen-year sentence for the firearms enhancement.

## ISSUES ON APPEAL

1. Did the district court err in denying Yager's motions to suppress?

2. Did the district court deny Yager his due process rights when it denied Yager's motion for change of venue?

3. Was Yager denied a fair trial by a fair and impartial jury when the district court determined not to dismiss two jurors who, during voir dire, expressed belief of Yager's guilt prior to trial?

4. On cross-appeal, did the district court err by interpreting the aggravating factor found in I.C. § 19–2515(h)(9) to be limited to murders involving an officer who engages the defendant in affirmative action consistent with official duties?

## ANALYSIS

### 1. Motion to Suppress

### A. The statements

Yager contends that the district court erred in denying his motion to suppress the first statements he made to Sergeant Middlemore, indicating that he was alone and that he had ridden his bicycle. Claiming he was in handcuffs and on the ground at the scene of the shooting, with a broken arm, surrounded by officers with their guns drawn and pointed at him, Yager asserts that his responses to the officer's questions were unwarned and involuntary and should have been suppressed.

■ The bifurcated review of a decision on a motion to suppress requires that we accept the trial court's findings of fact where supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. DuValt,* 131 Idaho 550, 552–53, 961 P.2d 641, 643–44 (1998); *State v. Shepherd,* 118 Idaho 121, 122, 795 P.2d 15, 16 (Ct.App.1990). We give due deference to any implicit findings of the trial court supported by substantial evidence. *State v. DuValt, supra, citing State v. Kirkwood,* 111 Idaho 623, 625, 726 P.2d 735, 737 (1986).

Irrefutably, Yager was in custody at the time he was handcuffed, and the district court so ruled. Under the facts of the case, however, the district court held that the "public safety" exception to *Miranda* applied and ruled Yager's statements admissible on that basis. The district court determined that there was no evidence that Yager's statements were other than voluntary and declined to suppress them.

■ *Miranda* warnings are triggered by custodial interrogation. *State v. Osborne,* 130 Idaho 365, 941 P.2d 337 (Ct.App.1997). Unwarned inculpatory statements obtained while in police custody are presumed to be compelled and thus are required to be excluded from evidence at trial in the state's case in chief. *State v. Nobles,* 122 Idaho 509, 511, 835 P.2d 1320, 1322 (Ct.App.1991), *citing Miranda v. Arizona,* 384 U.S. 436, 476, 86

S.Ct. 1602, 1628, 16 L.Ed.2d 694, 724 (1966). The United States Supreme Court has recognized, however, exigent situations, referred to as the "public safety exception" to excuse strict compliance with *Miranda* requirements. *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). The Court's rationale was expressed as follows:

> We conclude that the need for answers to questions in a situation posing a threat to public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination. We decline to place officers such as Officer Kraft in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.

*Id.* at 657, 104 S.Ct. at 2632, 81 L.Ed.2d at 558.[1]

Here, the State argued that the officer's questions were necessary to secure the safety of the officers and the public at the location where Trooper Huff was killed in an exchange of gunfire. It was imperative to learn if someone else was acting with Yager, who might pose a danger to the officers and the public. This Court finds Yager's statements that he was alone and on a bicycle were not obtained in violation of his Fifth Amendment rights, as the facts of this case bring the statements within the narrow exception to the *Miranda* rule prescribed in *Quarles*.

▆▆▆▆ When a defendant alleges an interrogation to be coercive, the State bears the burden of proving voluntariness of the defendant's confession by a preponderance of the evidence. *State v. Johns*, 112 Idaho 873, 878, 736 P.2d 1327, 1332 (1987), *citing Lego v.*

*Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). In order to determine the voluntariness of a confession, the Court must look to the "totality of the circumstances" and determine whether the defendant's will was overborne. *State v. Radford*, 134 Idaho 187, 191, 998 P.2d 80, 84 (2000), *citing Arizona v. Fulminante*, 499 U.S. 279, 287, 111 S.Ct. 1246, 1252, 113 L.Ed.2d 302, 316 (1991).

Yager argues that the environment in which he made the statements was coercive, even if the manner of questioning was not. When the officer questioned him, Yager was surrounded by officers with weapons drawn and aimed at him; he was handcuffed, suffered a broken arm, was made to lie prone until the officer allowed him to sit up. The arrest took place at the scene where Trooper Huff's body lay, before the location was secured. The State argues that the statements were not involuntary as a result of police coercion, citing authority that the presence of guns at the scene of an arrest is not evidence of coercion, but merely police procedure, *Turner v. State*, 738 N.E.2d 660, 662 (Ind. 2000), and that reasonable force to subdue a prisoner and transport him to the police station is not a police activity designed to coerce a confession. *Segerstrom v. State*, 301 Ark. 314, 783 S.W.2d 847(1990). *See also United States v. Lewis*, 465 F.2d 959, 960 (9th Cir. 1972) (participation of three or four officers in an arrest, with their guns drawn, did not constitute police coercion such that the defendant's statements were involuntary). The State, citing *Arizona v. Fulminante*, 499 U.S. 279, 306–312, 111 S.Ct. 1246, 1262–1266, 113 L.Ed.2d 302, 328–333 (1991), also argues the *de minimus* nature of the two statements and the overwhelming evidence establishing Yager's guilt render harmless the error, if any, in the admission of the statements.

After examining the totality of the circumstances, including consideration of the implication that Yager's arm was broken in the process of handcuffing, the district court concluded that Yager's will was not overborne

---

1. No Idaho case has cited *New York v. Quarles* and the "public safety exception." The Court of Appeals implied that the "public safety exception" was potentially available to justify the questioning by the police, however, it was not argued by the State. *See State v. Frank*, 133 Idaho 364 n. 4, 986 P.2d 1030 n. 4 (Ct.App.1999).

and thus, his statements were not involuntary, so as to justify suppression. Accordingly, we reach the same conclusion and we affirm the district court's decision denying the motion to suppress the statements.

### B. Items seized from his home

Next, Yager claims that items seized from his home were seized without probable cause, that is, based on a warrant that was not supported by specific allegations and information that the items were relevant to the crime and would be found in the location to be searched. Yager argues that the district court should have granted his motion to suppress these items.[2]

In this case three separate search warrants were issued by the magistrate based upon testimony of two law enforcement officers placed under oath pursuant to Idaho Criminal Rule 41(c). One of the warrants was for the defendant's parents' home where the defendant had been residing in a bedroom over which he had sole control. This testimony takes the place of the affidavit of probable cause. The testimony of the search warrant hearing is part of the appellate record.

In reviewing a determination of probable cause, we look at the warrant affidavit (transcript) submitted to the magistrate to determine whether it provided the magistrate with a substantial basis for concluding that probable cause existed. *Illinois v. Gates*, 462 U.S. 213, 239, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548 (1983); *State v. Lang*, 105 Idaho 683, 684, 672 P.2d 561, 562 (1983). Probable cause is determined by the magistrate from the facts set forth in the affidavits and from recorded testimony in support of the application for the warrant. *State v. Hagedorn*, 129 Idaho 155, 922 P.2d 1081 (Ct.App.1996). The determination is based on a "totality of the circumstances" test. U.S. Const. amend. IV; *State v. Lang, supra*. We accord great deference to the probable cause determinations of magistrates, *State v. Lang, supra*, resolving doubts in favor of the warrant. *See also Spinelli v.*

*United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

Although probable cause to believe that a person has committed a crime does not necessarily give rise to probable cause to search that person's home, magistrates are "entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense."

*State v. Molina*, 125 Idaho 637, 641, 873 P.2d 891, 895 (Ct.App.1994), *cert. denied*, 513 U.S. 992, 115 S.Ct. 493, 130 L.Ed.2d 403 (1994)(internal citations omitted). *See also State v. Dalton*, 73 Wash.App. 132, 868 P.2d 873 (1994), *quoting Commonwealth v. Kline*, 234 Pa.Super. 12, 335 A.2d 361 (1975)("Probable cause to believe that a man has committed a crime on the street does not necessarily give rise to probable cause to search his home.").

Probable cause to search requires a nexus between criminal activity and the item to be seized, and a nexus between the item to be seized and the place to be searched. U.S. Const. amend. IV; *State v. Hagedorn, supra*. Most courts require that a nexus between the items to be seized and the place to be searched must be established by specific facts; an officer's general conclusions are not enough. *See, e.g. United States v. Schultz*, 14 F.3d 1093, 1097 (6th Cir.1994); *United States v. Lalor*, 996 F.2d 1578, 1582–83 (4th Cir.1993), *cert. denied*, 510 U.S. 983, 114 S.Ct. 485, 126 L.Ed.2d 436(1993).

In its order denying the motion to suppress, the district court recited that the information presented to the magistrate was obtained by Officer Dixon, who had spoken with Yager's parents. The magistrate was informed of items found at the scene of the murder and that Yager had a bedroom to himself in his parents' home, that he had been extremely depressed and suicidal, and he had left home on Tuesday, June 16, 1998, at about 6:00 p.m.; the parents knew of no firearms owned by Yager; and on Tuesday, June 16, 1998, Yager had pawned his tools in Coeur d'Alene. The district court recited

---

2. Pursuant to the warrant, the State seized letters, notes, an empty ammunition box and uniform citations found in Yager's bedroom. The uniform citations alone were admitted into evidence at trial.

that based on this information, the magistrate had issued a search warrant to search Yager's residence and seize letters, notes, diary, guns, ammo, citations, motive evidence, drugs, paraphernalia, pawn slips and receipts. With the exception of "motive evidence," which the district court found was overbroad in scope, the district court held that the magistrate had a reasonable basis for his finding of probable cause to search for the remaining items listed in the warrant. After a review of the transcript and warrant, we agree with the district court's decision.

Additionally, the State urges the Court to apply the harmless error doctrine because no prejudice from the admission of the citations seized pursuant to the warrant (whether valid or unlawful) has been shown. *See State v. Hagedorn, supra.* The only items used at trial which were seized from the search of defendant's home were two uniform citations issued earlier by law enforcement officers other than the deceased. Because of the overwhelming evidence of Yager's guilt and the *de minimus* and cumulative nature of the evidence recovered in the search that was actually admitted at trial (the two citations), we conclude beyond a reasonable doubt that the error in the admission of the citations did not contribute to the conviction, even if they should have been suppressed.

### 2. Motion for Change of Venue

A motion to change venue is addressed to the discretion of the trial court. *State v. Winn,* 121 Idaho 850, 856, 828 P.2d 879, 885 (1992); *State v. Needs,* 99 Idaho 883, 591 P.2d 130 (1979). The validity of a court's decision to try a case in a particular venue is tested by whether, in the totality of existing circumstances, juror exposure to pretrial publicity resulted in a trial that was not fundamentally fair. *State v. Hyde,* 127 Idaho 140, 145, 898 P.2d 71, 76 (Ct.App.1995).

Yager's motion to the district court was based on the Constitution and the provisions of I.C.R. 21(a). In arguing the motion, Yager submitted a three-ring binder containing collected publicity about the case to the district court to show the impact on the community and prejudice that would preclude the selection of an impartial jury. For the benefit of this Court on appeal, Yager states that the pretrial publicity consisted of coverage of the shooting, the funeral of Trooper Huff, the impact of her death on her family, information about Yager's history and speculation as to his motive for the shooting. The publicity also included quotes from then Governor Batt commenting on the murder, the prosecutor, and various letters to the editor calling for Yager to explain himself and calling for proper punishment. Yager argues that the nature of the pretrial publicity was prejudicial to him and created juror bias against him that did not dissipate with the passage of time considering the minimal six-month period between the publicity and the trial, thereby denying him a fair trial by an impartial jury.

Publicity by itself does not require a change of venue, *State v. Bitz,* 93 Idaho 239, 460 P.2d 374 (1969), and error cannot be predicated on the mere existence of pretrial publicity concerning a criminal case. *State v. Hyde,* 127 Idaho at 145, 898 P.2d at 76. Where it appears that the defendant actually received a fair trial and that there was no difficulty experienced in selecting a jury, the denial of defendant's motion for change of venue is not a ground for reversal. *State v. Needs,* 99 Idaho at 890, 591 P.2d at 137. In determining whether a criminal defendant actually received a fair trial, the Court will consider, among other factors, affidavits indicating prejudice or absence of prejudice in the community where he or she is tried, the testimony of jurors at voir dire as to whether they formed an opinion of the defendant's guilt or innocence based upon adverse publicity, whether the defendant challenged for cause any of the jurors finally selected, the nature and content of pre-trial publicity and the amount of time elapsed from the time of the publicity to the trial. *State v. Needs, supra.*

At the voir dire, which was conducted by the trial judge with each potential juror individually, thirty out of seventy-six jurors admitted that they had formed the opinion that Yager was guilty, that the police had arrested the right person or that the prosecution indicated that Yager had some connection to the case. Fifteen of the thirty jurors were

excused for cause. Defense counsel's challenges to the remaining fifteen were overruled, and they were retained as potential jurors. All peremptory challenges were exercised, after which the defense renewed its motion, arguing that the panel still contained persons who were not impartial because of the impact of pre-trial publicity.

 The district court found that the media coverage was "by and large ... both factual and non-inflammatory" and not such as to adversely affect juror impartiality. The fifteen jurors who were not excused all stated to the trial judge that they could set aside any opinions they had formed from news accounts, listen to the evidence presented in the courtroom, and decide the case solely on that evidence. Under the settled rule, it must be shown that the prejudice against a defendant is of such magnitude as to prevent him from receiving a fair and impartial trial; and where the evidence before the court is conflicting, the decision will not be reversed on appeal. *State v. Cypher*, 92 Idaho 159, 166, 438 P.2d 904, 911 (1968). There was overwhelming evidence against Yager, and he has not shown that the setting of the trial was inherently prejudicial or that actual prejudice can be inferred from the jury-selection process of which he complains. *State v. Hyde*, 127 Idaho at 145, 898 P.2d at 75. We conclude that the district court did not abuse its discretion in denying Yager's requested change of venue.

### 3. Challenge to two jurors

Continuing to focus on the jury, Yager expressed dissatisfaction with two jurors, who were challenged for cause but retained by the district court. He claims Juror Wilson's and Juror Chandler's admitted preconceived opinions regarding Yager's guilt should have disqualified the jurors for bias despite their assurances that they would set aside their opinions and be fair and impartial.

 The decision whether a juror can render a fair and impartial verdict is directed to the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *State v. Hedger*, 115 Idaho 598, 768 P.2d 1331 (1989). It is not incumbent upon the trial judge to find jurors who are totally ignorant of the facts and issues involved in this case. *See Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *State v. Needs, supra.* The test has been set forth as follows:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Id.* at 800, 95 S.Ct. at 2036, 44 L.Ed.2d at 595, *quoting Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

Juror Chandler never indicated that he had formed an opinion as to Yager's guilt or innocence. He did state that at the time of the arrest, he believed that the person they arrested was probably guilty of murdering Trooper Huff and that nothing he had seen in the media or discussed with others had changed that belief. He stated unequivocally to the court that his opinion would not affect his deliberations as a juror. Juror Wilson initially told the trial judge that she "figured it cut and dry" from the television reports she had seen; but on further questioning by the court, she denied that she had formed an opinion. Juror Wilson explained not that she was convinced the person who was arrested was the person who had murdered Trooper Huff, but that "it was pretty much all right there in one spot where it all happened and they didn't have to chase anybody or there wasn't a question." She claimed that she had not heard anything recently about the case and that she was prepared to set aside all she had learned and to listen to the evidence presented in court alone to reach a verdict.

 Although not always dispositive, the trial judge is entitled to rely on assurances from venire persons concerning partiality or bias. *See State v. Hairston*, 133 Idaho 496, 506, 988 P.2d 1170, 1180 (1999), *cert. denied*, 529 U.S. 1134, 120 S.Ct. 2014, 146 L.Ed.2d 963 (2000). As the appellate court has previously stated:

Having formed or expressed an unqualified opinion or belief that the defendant is guilty, or not guilty, of the offense charged indicates an implied bias and is thereby a basis for challenging a juror for cause. I.C. 19–2020. A challenge for cause is to be decided upon by the trial court. I.C. §§ 19–2024, –2027. That decision is discretionary in nature. *State v. Grube*, 126 Idaho 377, 385, 883 P.2d 1069, 1077 (1994), *cert. denied*, 514 U.S. 1098, 115 S.Ct. 1828, 131 L.Ed.2d 749 (1995); *State v. Hedger*, 115 Idaho 598, 600–01, 768 P.2d 1331, 1333–34 (1989).

*State v. Gray*, 129 Idaho 784, 801, 932 P.2d 907, 924 (Ct.App.1997). The jurors' testimony above is not indicative of an opinion that would raise a presumption of partiality. We therefore hold that the decision not to excuse Jurors Wilson and Chandler was within the discretion of the trial court.

*4. Interpretation of I.C. § 19–2515(h)(9)*

The district court issued its Findings Considering the Death Penalty under I.C. § 19–2515 and entered its Judgment on August 16, 1999. In its findings, the district court found that there were no facts to support the statutory aggravating circumstances described in I.C. § 19–2515(h)(1, 2, 3, 4, 7, 8 & 10). As to (h)(5, 6 & 9), the district court found that the state had not proved the aggravating circumstances described therein beyond a reasonable doubt.

The issue raised by the State on cross-appeal is the district court's interpretation of I.C. § 19–2515(h)(9) as a narrowing of the first-degree murders of a police officer, defined in I.C. § 18–4003(b), which may be subject to the death penalty. The State disputes that the intent of the legislature in enacting I.C. § 19–2515(h)(9) was to limit a death eligible murder of a peace officer only

to the murder of an officer who actively engages the defendant in affirmative action consistent with official duties. The State argues that an officer, who is in uniform and on duty, as Trooper Huff was when she was shot and killed, is murdered "because of the exercise of official duty," thus putting the murder squarely within the language of I.C. § 19–2515(h)(9).

Yager contends that I.C. § 19–2515(h)(9) is not ambiguous and therefore not subject to statutory interpretation. He submits that the Oxford Reference Dictionary definition of the term "because of" means "on account of; by reason of" and the word "exercise" means to "perform (a function)." Yager argues that the district court relied on the literal language of the statute and properly held that the aggravator (h)(9) applies when an officer is killed because of something he/she did as a police officer. Yager also argues that the legislature's stated purpose for enacting the aggravators [3] was to further narrow the class of first-degree murder cases to the few cases in which the death penalty is appropriate, which supports the district court's decision not to apply I.C. § 19–2515(h)(9) to Yager's case.

This issue, then, is a question of statutory interpretation, which is a question of law over which we exercise free review. *Crawford v. Dep't of Correction*, 133 Idaho 633, 991 P.2d 358 (1999); *State v. Nickerson*, 121 Idaho 925, 927, 828 P.2d 1330, 1332 (Ct. App.1992). The Supreme Court interprets statutes according to the plain, express meaning of the provision in question, and will resort to judicial construction only if the provision is ambiguous, incomplete, absurd, or arguably in conflict with other laws. *Peasley Transfer & Storage Co. v. Smith*, 132 Idaho 732, 979 P.2d 605 (1999). It is a

---

**3.** The Statement of Purpose reads as follows:

Only a few years ago, the United States Supreme Court made new "rules" concerning imposition of the death penalty for serious crimes. So that we conformed with this U.S. Supreme Court interpretation of the federal Constitution, the Idaho Legislature enacted in 1973 our present death penalty Sections 18–4003 and 18–4004, Idaho Code.

Then last year, the United States Supreme Court again changed the rules relating to capi-

tal punishment—after many states, like Idaho, had acted in response to its previous decision. The Court, in five cases, set forth new, more definitive rules concerning sentencing where the death penalty sought to be imposed.

The purpose of this bill is to codify into Idaho law these present requirements imposed on the states by these most recent United States Supreme Court decisions on capital punishment so that we will conform with this latest expression of the law.

fundamental law of statutory construction that statutes that are in *pari materia* are to be construed together, to the end that the legislative intent will be given effect. *State v. Creech,* 105 Idaho 362, 367, 670 P.2d 463, 468, *cert. denied,* 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 722 (1984). Where a statute with respect to one subject contains a certain provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different intention existed. *Kopp v. State,* 100 Idaho 160, 164, 595 P.2d 309, 314 (1979). In attempting to discern and implement the intent of the legislature, the court may seek edification from the statute's legislative history and contemporaneous context. *State v. Burnight,* 132 Idaho 654, 978 P.2d 214 (1999). Constructions of a statute that would lead to absurd or unreasonably harsh results are disfavored. *Payette River Property Owners Ass'n v. Board of Comm'rs of Valley County,* 132 Idaho 551, 976 P.2d 477 (1999). In construing criminal statutes, courts are free to consider effect and consequence of differing and available constructions of a statute. *State v. Webb,* 76 Idaho 162, 279 P.2d 634 (1955).

The district court correctly noted that I.C. § 18–4003 and I.C. § 19–2515 were initially adopted in the same legislative act, S.L.1977, ch. 154, §§ 2 & 4, p. 390. The jury in Yager's case rendered a verdict of guilty of first-degree murder pursuant to I.C. § 18–4003(b), which provides in part,

> "any murder of any peace officer ... who *was acting in the lawful discharge of an official duty,* and was known or should have been known by the perpetrator of the murder to be an officer so acting, shall be murder in the first degree." (Emphasis added).

The Court is being asked to decide whether, with the same facts, the murder of an officer "acting in the lawful discharge of an official duty" also satisfies the statutory aggravator (h)(9), which provides that "a murder committed against a former or present peace

officer, ... *because of the exercise of official duty."* (Emphasis added).

In *State v. Pratt,* 125 Idaho 594, 873 P.2d 848 (1994), the Court determined that a law enforcement officer of the United States Forest Service, whose authority was derived from a cooperative agreement between the Service and Bonner County, was not acting in the lawful discharge of a "peace officer's" duty at the time he was fatally shot *on private land. Id.* at 598, 873 P.2d at 852(Emphasis added). Consequently, the Court held that the shooting did not qualify as first-degree murder under I.C. § 18–4003(b). The Court's ruling explained that the authority of the Forest Service officer to act as a peace officer extended only to National Forest lands and water within the State. Such is not the case with a State Patrol Officer, who is sworn to enforce the laws within the State and whose actions in the capacity of an officer would be "in the lawful discharge of a peace officer's duty." The Court, however, has yet to interpret the language of I.C. § 19–2515(h)(9)—"because of the exercise of official duty."

The district court found the difference in the language of the two statutes to be meaningful. We find it difficult to believe that the legislature would use different language, except to distinguish the elements of first-degree murder of a peace officer from first-degree murder of a peace officer that could entail a penalty of death. In addition to different terms, I.C. § 19–2515(h)(9) expressly applies to "present and former peace officers," which could lead to an anomaly that a defendant who killed a former peace officer could be found not guilty of first-degree murder, but guilty of the aggravator. If the legislature intended the same proof to invoke both statutes, it could have and probably would have used the same words. *See Kopp v. State,* 100 Idaho at 164, 595 P.2d at 313.

The State has challenged the district court's factual findings,[4] particularly the finding that "Trooper Huff was killed because

---

4. The unchallenged findings that the district court found were proved beyond a reasonable doubt were that Trooper Huff was in the exercise of her official duties when she was murdered by Yager; that when Yager murdered Trooper Huff

he knew she was an Idaho State Police Officer; that when Yager murdered Trooper Huff he knew she was in the exercise of her official duties; and that Yager intended to kill a police officer.

she was a police officer, not because of anything she had done as a police officer—not because of her exercise of official duty." The State, however, asserted no facts to show any prior interaction or relationship between Yager and Trooper Huff that may have explained Yager's actions on June 17, 1999, which were directed at Trooper Huff personally. The district court's finding that Trooper Huff's mere status as a police officer was the basis for her murder is thus insufficient to support a conclusion that the aggravating factor of (h)(9) was proven beyond a reasonable doubt. The district court's interpretation of the statute was reasonable. Therefore, we affirm the fixed life term, followed by a fixed term firearms enhancement of fifteen years, imposed by the district court.

Because we uphold Judge Judd's decision there is no need to address the double jeopardy issues which might be present if a resentencing were needed.

## CONCLUSION

The district court's denial of Yager's motion to suppress his initial statements in response to questioning is affirmed. With respect to the denial of Yager's motion to suppress the items seized under the warrant, the record on appeal is inadequate to evaluate whether the warrant lacked probable cause; however, we conclude that any error in the admission of the uniform citations that were seized did not contribute to Yager's conviction, even if the uniform citations should have been suppressed. We affirm the discretionary decisions of the district court denying the motion for change of venue and the request to excuse Jurors Wilson and Chandler. Finally, we uphold the district court's determination that the statutory aggravator found in I.C. § 19–2515(h)(9) is appropriate only to those cases where a police officer was killed by reason of the performance of an official duty.[5] The sentence imposed by the district court is hereby affirmed.

5. I.C. § 19–2515(9)(i) (formerly I.C. § 19–2515(h)(9)) as amended in 2003 now reads: "The murder was committed against a former or present peace officer, executive officer, officer of the

Chief Justice TROUT and Justices SCHROEDER, KIDWELL and EISMANN concur.

court, judicial officer, or prosecuting attorney because of the exercise of official duty or because of the victim's former or present official status."